CANADY, J.,
dissenting.
The trial court’s order denying Walls’ claim should be affirmed. In reversing the trial court’s order, the majority makes three fundamental errors. First, the majority ignores a deficiency in Walls’ case— his failure to show juvenile onset—that bars him from success on his claim of intellectual disability. Second, the decision here goes on needlessly to consider Hall v. Florida, — U.S. -, 134 S.Ct. 1986, 188 L.Ed.2d 1007 (2014), and in the process misconstrues the holding in Hall. Third, the Court erroneously concludes that Hall should be given retroactive application.
I.
This case is easily resolvable without any discussion of the scope of Hall’s holding regarding IQ scores or consideration of whether Hall should be applied retroactively. The trial court correctly denied Walls’ intellectual disability claim because the evidence showed without dispute that as a juvenile Walls had IQ scores of 102 (at age 12) and 101 (at age 14). Based on these IQ scores, Walls could not establish that he met the third prong of the test for intellectual disability, which requires that the condition be “manifested during the period from conception to age 18.” § 921.137(1), Fla. Stat. (2006). This requirement of juvenile onset was not at issue and played no part in the Court’s analysis in Hall. So nothing in Hall supports the conclusion that the third prong does not remain a valid requirement of law. The third prong therefore defeats Walls’ claim. And the trial court’s rejection of the claim on that basis should be affirmed.
II.
The majority states that Hall requires that “defendants with IQ scores that are higher than 70 must still be permitted to present evidence of all three prongs of the test for intellectual disability.” Majority op. at 346. According to the majority, Hall requires that “no single factor ... be considered dispositive” but that every intellectual disability claim must instead be given “holistic review.” Majority op. at 346, 346, 347. Thus, by the reasoning of the majority, an individual with an IQ of 80, 100, 125, or 150 would nonetheless—as part of the “holistic review” process—-be entitled to present evidence of adaptive deficits to establish intellectual disability. But this is not consistent with what the Supreme Court actually decided in Hall.
Hall declared unconstitutional Florida’s “rigid rule” “defin[ing] intellectual disability to require an IQ test score of 70 or less”—a rule that failed to take into account the 5-point standard error of measurement (SEM) for IQ tests. Hall, 134 S.Ct. at 1990. The Court was crystal clear concerning the question at issue: “That strict IQ score cutoff of 70 is the issue in this case.” Id. at 1994. In line with that statement of the issue, the Court noted that “Petitioner does not question the rule in States which use a bright-line cutoff at 75 or greater.” Id. at 1996. Therefore, contrary to the majority’s mandate of “holistic review,” nothing in Hall *350 calls into question the statutory provision that intellectual disability can be established only if a person suffers from “significantly subaverage general intellectual functioning,” which “means performance that is two or more standard deviations from the mean score on a standardized intelligence test.” § 921.137(1). That threshold, independent requirement should not be cast aside in the name of “holistic review.” Contrary to the majority’s reasoning, Hall recognizes that the existence of an IQ score evidencing significantly subaverage general intellectual functioning is a threshold requirement for determining whether an individual is intellectually disabled: “For professionals to diagnose—and for the law then to determine—whether an intellectual disability exists once the SEM applies and the individual’s IQ score is 75 or below the inquiry would consider factors indicating whether the person had deficits in adaptive functioning.” Hall, 134 S.Ct. at 1996 (emphasis added).
The holding of Hall is that the SEM must be taken into account in determining whether an individual is intellectually disabled. Throughout its opinion, the Court in Hall focuses on Florida’s failure to consider the SEM. And the Court repeatedly identifies that failure as the basis for its decision. The Court observed that “[t]he clinical definitions of intellectual disability, which take into account that IQ scores represent a range, not a fixed number, were a fundamental premise of Atkins[ v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002),]” and that “those clinical definitions have long included the SEM.” Id. at 1999. The Court went on to state that “[b]y failing to take into account the SEM and setting a strict cutoff at 70, Florida ‘goes against the unanimous professional consensus.’ APA Brief 15.” Id. at 2000. In line with that consensus, the Court announced its “independent assessment that an individual with an IQ test score ‘between 70 and 75 or lower,’ Atkins, supra, at 309, n. 5, 122 S.Ct. 2242, may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning.” Id. Thus, the Court “agree[d] with the medical experts that when a defendant’s IQ test score falls within the test’s acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits.” Id. at 2001. The Court reiterated: “By failing to take into account the standard error of measurement, Florida’s law not only contradicts the test’s own design but also bars an essential part of a sentencing court’s inquiry into adaptive functioning.” Id. So when an individual’s IQ score is determined to be greater than 75—and the SEM thus has been taken into account—the holding of Hall has no bearing on the case.
III.
I reject the majority’s conclusion that Hall should be given retroactive application under Witt v. State, 387 So.2d 922 (Fla.1980), “as a development of fundamental significance that places beyond the State of Florida the power to impose a certain sentence.” Majority op. at 346. Contrary to the majority’s reasoning, Hall places no categorical limitation on the authority of the state to impose a sentence of death. Hall requires that the SEM of IQ tests be considered, but it does not preclude death sentences for individuals whose scores fall within the SEM. Although Hall’s IQ score fell within the SEM, the Court recognized that his score was not sufficient to establish that he was intellectually disabled: “Freddie Lee Hall may or may not be intellectually disabled, but the law requires that he have the opportunity to present evidence of his in *351 tellectual disability, including deficits in adaptive functioning over his lifetime.” Hall, 134 S.Ct. at 2001; see also In re Henry, 757 F.3d 1151, 1161 (11th Cir.2014) (holding in the context of federal habeas corpus review that Hall has no retroactive effect because it does not articulate a “rule placing a class of individuals beyond the state’s power to execute” but “merely provides new procedures for ensuring that States do not execute members of an already protected group”).
I would also conclude that Hall is not a change in the law of “fundamental significance” under the Stovall/Linkletter[7] test adopted in Witt for determining “changes of law which are of sufficient magnitude to necessitate retroactive application.” Witt, 387 So.2d at 929, 931. This test recognizes
that the essential considerations in determining whether a new rule of law should be applied retroactively are essentially three: (a) the purpose to be served by the new rule; (b) the extent of reliance on the old rule; and (c) the effect on the administration of justice of a retroactive application of the new rule.
Id. at 926. In Witt, the Court recognized that under this test “evolutionary refinements”—in contrast to “jurisprudential upheavals”—do not warrant retroactive application:
In contrast to these jurisprudential upheavals are evolutionary refinements in the criminal law, affording new or different standards for the admissibility of evidence, for procedural fairness, for proportionality review of capital cases, and for other like matters. Emergent rights in these categories, or the retraction of former rights of this genre, do not compel an abridgement of the finality of judgments. To allow them that impact would, we are convinced, destroy the stability of the law, render punishments uncertain and therefore ineffectual, and burden the judicial machinery of our state, fiscally and intellectually, beyond any tolerable limit.
Id. at 929-30. Hall represents just such an evolutionary refinement in the law. I thus would conclude that Hall should not be given retroactive effect under the Sto-vall/Linkletter test based on (a) Hall’s purpose of adjusting at the margin the definition of IQ scores that evidence significant subaverage intellectual functioning, (b) the State’s reliance on Cherry ⅛[8] holding in numerous cases over an extended period of time, and (c) the ongoing threat of major disruption to application of the death penalty resulting from giving retroactive effect to Hall as well as similar future changes in the law regarding aspects of the definition of intellectual disability.
Finally, I would conclude that Hall does not constitute “a new substantive rule of constitutional law” for which federal law requires retroactive application. Montgomery v. Louisiana, — U.S. -, 136 S.Ct. 718, 729, 193 L.Ed.2d 599 (2016). The Supreme Court has explained this category of substantive rules that must be given retroactive effect:
Substantive rules, then, set forth categorical constitutional guarantees that place certain criminal laws and punishments altogether beyond the State’s power to impose. It follows that when a *352 State enforces a proscription or penalty barred by the Constitution, the resulting conviction or sentence is, by definition, unlawful. Procedural rules, in contrast, are designed to enhance the accuracy of a conviction or sentence by regulating “the manner of determining the defendant’s culpability.” Schriro[ v. Summerlin, 542 U.S. 348, 353, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004)]; Teague[ v. Lane, 489 U.S. 288, 313, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality opinion)]. Those rules “merely raise the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise.” Schriro, supra, at 352 [124 S.Ct. 2519]. Even where procedural ei-ror has infected a trial, the resulting conviction or sentence may still be accurate; and, by extension, the defendant’s continued confinement may still be lawful. For this reason, a trial conducted under a procedure found to be unconstitutional in a later case does not, as a general matter, have the automatic consequence of invalidating a defendant’s conviction or sentence.
Id. at 729-30. The Court thus has recognized that retroactive application is appropriate because the “possibility of a valid result does not exist where a substantive rule has eliminated a State’s power to proscribe the defendant’s conduct or impose a given punishment.” Id. at 730; see also Welch v. United States, — U.S. -, 136 S.Ct. 1257, 1266, 194 L.Ed.2d 387 (2016) (“[T]he Court has adopted certain rules that regulate capital sentencing procedures in order to enforce the substantive guarantees of the Eighth Amendment. The consistent position has been that those rules are procedural, even though their ultimate source is substantive.”).
In explaining why states should be required to give retroactive effect to such new substantive rules, the Court stated:
[T]he retroactive application of substantive rules does not implicate a State’s weighty interests in ensuring the finality of convictions and sentences. Teague warned against the intrusiveness of “continually forcing] the States to marshal resources in order to keep in prison defendants whose trials and appeals conformed to then-existing constitutional standards.” 489 U.S. at 310, 109 S.Ct. 1060. This concern has no application in the realm of substantive rules, for no resources marshaled by a State could preserve a conviction or sentence that the Constitution deprives the State of power to impose.
Montgomery, 136 S.Ct. at 732.
The change in the law accomplished by Hall does not render any sentence “by definition, unlawful.” Id. at 730. Hall “merely raise[s] the possibility” that someone found not to be intellectually disabled could be determined to be intellectually disabled. Id. (quoting Schriro, 542 U.S. at 352, 124 S.Ct. 2519). And if Hall is given retroactive application, the state will most certainly be required to “marshal resources” to sustain death sentences that have been imposed. Id. at 732 (quoting Teague, 489 U.S. at 310, 109 S.Ct. 1060). The rule adopted by Hall therefore is not a substantive rule that is required to be given retroactive effect under federal law.
POLSTON, J., concurs.

. Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965).

. Cherry v. State, 959 So.2d 702, 712-13 (Fla.2007) (holding that SEM need not be taken into account), cert. denied, 552 U.S. 993, 128 S.Ct. 490, 169 L.Ed.2d 344 (2007), abrogated by Hall v. Florida, — U.S. -, 134 S.Ct. 1986, 188 L.Ed.2d 1007 (2014).