PARIENTE, J.,
dissenting.
I dissent because the jury’s 9-3 recommendations for death render Asay’s sentences of death constitutionally unreliable pursuant to Florida’s independent right to trial by jury under article I, section 22, of the Florida Constitution, as well as the right to trial by jury under- the Sixth Amendment to the United' States Constitu *704 tion, and the right against cruel and unusual punishment under the Eighth Amendment to the United States Constitution. Asay’s execution is set for August 24, 2017. Asay will be the first defendant put to death in Florida since the United States Supreme Court held Florida’s capital sentencing scheme unconstitutional in January 2016. Hurst v. Florida, — U.S. —, 136 S.Ct. 616, 193 L.Ed.2d 504 (2016). Not only was Asay’s sentence imposed under a statute that was rendered unconstitutional under the Sixth Amendment, but his execution will be the result of a 9-3 jury recommendation for death,[7] which this Court has declared unreliable under the Eighth Amendment to the United States Constitution. Hurst v. State (Hurst), 202 So.3d 40, 60 (Fla. 2016), cert. denied, — U.S. —, 137 S.Ct. 2161, 198 L.Ed.2d 246 (2017).
In addition, I dissent because Asay has been wrongly denied access to the complete set of documents that may support his claim that Florida’s newest lethal injection protocol, which has yet to be administered on any criminal defendant in this state or any other state, violates the Eighth Amendment and stands counter to this Court’s opinions in Muhammad v. State, 132 So.3d 176 (Fla. 2013), and Valle v. State, 70 So.3d 525 (Fla. 2011). In its rush to execute Asay, the State has jeopardized Asay’s fundamental constitutional rights and treated him as the proverbial guinea pig of its newest lethal injection protocol.
First, I would stay Asay’s execution until the United States Supreme Court addresses his pending petition for a writ of certiorari. Although the State delayed filing its response to Asay’s petition for a writ of certiorari in the United States Supreme Court, the State simultaneously certified to the Governor that there were no outstanding stays on Asay’s execution and, therefore, the Governor could proceed with rescheduling Asay’s execution. Thus, the State urged the Governor to reschedule Asay’s execution while stalling at the United States Supreme Court. This conduct should not be rewarded.
As to the most compelling constitutional argument, for the reasons fully set forth in my concurring in part and dissenting in part opinion in Asay V and, most recently, my dissenting opinion in Hitchcock v. State, No. SC17-445, 226 So.3d 216, 2017 WL 3431500 (Fla. Aug. 10, 2017), I would apply Hurst retroactively to Asay to ensure that he is afforded the same basic fundamental protections as Timothy Hurst and other defendants.
I. Pending Petition for Writ of Certiorari
I would stay Asay’s execution to allow the United States Supreme Court to determine whether it will grant or deny Asa/s pending petition for writ of certiorari from this Court’s opinion in December 2016. Asay V, 210 So.3d 1. The State’s actions— representing to the Governor that there were no stays on Asay’s execution, while obtaining Asay’s prior consent to an extension in which to file a response to Asay’s petition for a writ of certiorari—should not be condoned. During the nineteen years I have served on this Court, we have never allowed an execution to proceed while there are pending matters in other courts regarding the crime for which the defendant was to be executed. Asay is entitled to resolution of his outstanding constitutional claims before being executed. I hope that the United States Supreme Court will intervene to prevent such a clear injustice.
*705 II. Florida’s New Lethal Injection Protocol
I also dissent because the incomplete discovery allowed to Asay compromised his ability to establish his claim that Florida’s newly established lethal injection protocol constitutes cruel and unusual punishment under the Eighth Amendment, leading to postconviction proceedings that were anything but full and fair. On January 4, 2017, the Florida Department of Corrections (DOC) adopted Florida’s new lethal injection protocol (“the new protocol”). On July 28, 2017, after an evidentiary hearing, the circuit court denied Asay’s motion for postconviction relief challenging the constitutionality of the new protocol.
Asay argues that the new protocol is unconstitutional under the Eighth Amendment because it creates a substantial risk of harm, and, in light of other, readily available drugs that have no risk of pain, Asay has established a right to relief. Majority op. at 700-01. Specifically, Asay argues that the new protocol violates the Eighth Amendment because etomidate, which replaced midazolam as the first drug in the three-drug lethal injection protocol, causes venous pain upon injection and myoclonus—seizure-like movement. The parties stipulate that etomidate has never been used in a lethal injection anywhere in the United States.
In Glossip v. Gross, — U.S. —, 135 S.Ct. 2726, 192 L.Ed.2d 761 (2015), the United States Supreme Court set the standard for establishing that a State’s lethal injection protocol amounts to cruel and unusual punishment under the Eighth Amendment. To obtain relief, a “condemned prisoner [must] establish ] that the State’s lethal injection protocol creates a demonstrated risk of severe pain. [And] [h]e must show that the risk is substantial when compared to the known and available alternatives.” Id. at 2737 (quoting Baze v. Rees, 553 U.S. 35, 61, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008)) (third and fourth alterations in original). While I agree that Asay has not yet met this very high standard for granting relief on this claim under the evidence presented, I write to explain why Asay should be granted further requested discovery to establish his claim.
Asay argues that “numerous states, including those with the most active death chambers, use a single drug protocol, without any reported incidents.” Initial Br. of App., Asay v. State, SC17-1400 (Fla.), at 67. As I wrote ten years ago, I am at a loss to understand why this State has not done so. Schwab v. State, 973 So.2d 427, 429 (Fla. 2007) (Pariente, J., concurring). As I wrote in Schwab, “[i]f I were in the executive branch and in charge of lethal injections for this state, I would urge the adoption of a one-drug protocol so that only a lethal dose of sodium pentothal would be necessary.” Id. (Pariente, J., concurring). I would also explore “other means to monitor the state of consciousness, such as the Bispectral Index (BIS) monitor, and would employ individuals who have the medical training and expertise necessary to adequately assess consciousness.” Id. at 430 (Pariente, J., concurring). This is especially concerning in light of the evidence presented in this case that the new drug, etomidate, produces an incredibly short state of unconsciousness. But I am not the executive branch.
On the other hand, what is within the province of the judicial branch is staying the execution until Asay receives the required discovery to properly challenge the new protocol. Asay argues that he was wrongly denied access to documents relating to the new protocol, and I agree. Majority op. at 699. The majority opinion summarily dismisses this claim, contending that “[b]ecause Asay cannot demonstrate that he is entitled to relief on claims relat *706 ed to these records, the circuit court prop--erly summarily denied relief.” Majority op. at 700. However, the majority misses the point. Asay has a colorable claim for relief, that a new lethal injection protocol—yet to be administered on any defendant in any state—could violate Asay’s right against cruel and unusual punishment. Asay needs the records for the exact purpose contemplated under Florida Rule of Criminal Procedure 3.852(i)(2), to prove that his own execution with the new protocol will constitute cruel and unusual punishment. Majority op, at 700-01. His timely request was not a “fishing expedition,” as he had no reason to know that the new protocol would apply to him until he received notice from the DOC on July 10, 2017. Majority op. at 700 (quoting Sims v. State, 753 So.2d 66, 70 (Fla. 2000)).
The State adopted the new protocol on January 4, 2017. However, despite its explicit requirement that the new protocol be provided to the defendant “after the warrant is signed,” which in this case was on January 8, 2016, it was not until the circuit court ordered the State to file and serve a copy of the protocol on July 10, 2017, that Asay received a copy of the new protocol. See majority op. at 698-99. Thus, the State, which admittedly anticipated litigation surrounding the new protocol, purposefully delayed for more than six months providing the information necessary to challenge it—namely the new drugs used—to Asay who had been the subject of an active death warrant.
Rather than giving Asay time to procure the documents needed to challenge this never-before-used protocol, the State now contends that time is of the essence in meeting the execution deadline of August 24, 2017, chosen by Governor Scott. Majority op. at 699. Even more troublesome, the State has relentlessly fought Asay’s attempts to obtain records relating to the new protocol, causing even further delay. One would assume that the administration of the ultimate penalty of death would compel the State to proceed transparently, rather than under the veil of executive privilege, indeed, the State said as much when adopting the new protocol on January 4, 2017; * Julie L. Jones, Secretary of the Department of Corrections, represented that “[additional guiding principles of the lethal injection process are - that it should not be of long duration, and that while the entire process of execution should be transparent, the concerns and emotions of all those involved must be addressed.” Reply Brief, Asay v. State, SC17-1400 (Fla.), at 8.
When Asay and his counsel learned of the new protocol, they immediately filed a public records request with both the DOC and the Florida Department of Law Enforcement (FDLE) requesting information related to the new drugs to be used in the new protocol. Both the DOC and the FDLE objected to this request. In fact, it was only after Asay’s motion for rehearing that the circuit court granted, in part, his request for documents. Eventually, the DOC disclosed mostly redacted records relating to the new protocol. To this date, the State has refused to indicate why the new protocol was adopted or identify the manufacturer of the drugs used in the new protocol. The State’s attempts to shift the burden to Asay are improper; it is the State’s duty, as the party who holds the information, to make it available to Asay.
The State’s actions in this case run afoul of this Court’s opinions in both Muhammad and Valle. In Valle, this Court remanded in part Valle’s case for an eviden-tiary hearing concerning the efficacy, of one of the drugs used in the lethal injection protocol as an anesthetic. 70 So.3d at 526. This Court’s primary concern in remanding for an evidentiary hearing centered on the contention that “ ‘ if the in *707 mate is not fully unconscious when either pancuronium bromide or potassium chloride [the second and third drugs in the protocol] is injected, or when either of the chemicals begin to take effect, the prisoner will suffer pain.’” Id. (quoting Lightbourne v. McCollum, 969 So.2d 326, 351 (Fla. 2007)). For Valle to fully litigate this claim, this Court further ordered that, the “DOC ... produce correspondence and documents it has received from the manufacturer of pentobarbital concerning the drug’s use in executions, including those addressing any safety and efficacy issues.” Id. Thus, in Valle, this Court determined that as much information as possible from the drug manufacturer was necessary to ensure that Valle’s right against cruel and unusual punishment under the Eighth Amendment was not violated. Indeed, this Court, addressing similar concerns in Muhammad, required the DOC to provide Muhammad “correspondence' and documents it received from Hospira [the manufacturer of the drug] concerning the drug’s use in executions or otherwise, including those addressing any safety and efficacy issues.” 132 So.3d at 192.
Additionally, the DOC has refused to disclose to Asay information relating to previous executions in the State, even though this information was relied upon by the DOC’s expert witness, Buffington, to dismiss Asay’s arguments regarding the constitutionality of the new protocol. See majority op. at 701. Indeed, Asay attempted to challenge certain aspects of the new protocol, including the timing of the consciousness check, but was unable to do so because the DOC refused to honor his public records request. The evidentiary hearing in this case makes clear that the timing of the steps in the execution process are essential given the limited amount of time for which etomidate produces unconsciousness. See majority op. at 701. The best way to review and predict the timing of the steps in Asay’s execution would be to refer to the DOC and FDLE logs, notes, memoranda, letters, electronic mail, and facsimiles relating to the prior six executions. Yet, both organizations have refused to produce the requested documents.
Even accepting the use óf a three-drug protocol, it is troublesome that the State deliberately concealed the identity of the manufacturer of the challenged drug—eto-midate. I would grant disclosure of the manufacturer’s identity to allow Asay the opportunity to fully present his claim that the new protocol amounts to cruel and unusual punishment. At the evidentiary hearing before the circuit court, considerable testimony was presented relating to both the efficacy of etomidate and whether it causes pain. Majority op. at 701. Additionally, there was some, disagreement about how quickly etomidate induces unconsciousness and the duration of the state of unconsciousness, which apparently differs depending on the dosage. Despite all of these concerns, which, are similar to those in both Valle and Muhammad, Asay has not been provided the manufacturer’s identity, nor was he given adequate time to attain the necessary information to thoroughly contest the new protocol. The manufacturer of the drug, who has itself stated that the drug will be “misused” if it is used for executions, could shed light on the data used to compose the drug’s- package insert, which details safety and use information, to properly interpret the-language in the package insert, and to generally provide the most accurate information relating to the administration of the most final of penalties. See majority op. at 701.
In sum, the State’s actions in both intentionally failing to disclose the new protocol to Asay for Over six months and then continuing to fight every one of his requests for production display a rush to execution without first ensuring that this *708 execution withstands constitutional scrutiny. Through no fault of his own, Asay was unable to properly prepare his multiple challenges to Florida’s new lethal injection protocol, which has yet to be administered on Asay or any other capital defendant in the United States.
III. Retroactivity of the Eighth Amendment Right to Unanimity
In his petition for a writ of habeas corpus at issue in this case, Asay claims a right to retroactive application of the Eighth Amendment right to unanimity in the jury’s final recommendation for death. See Hurst, 202 So.3d at 59-63. As I stated in my dissenting opinion in Hitchcock, this Court’s opinion in Asay V is not dispositive on the retroactive application of the Eighth Amendment right to unanimity in the jury’s recommendation for death. See Hitchcock, slip op. at 9-10, 2017 WL 3431500 (Pariente, J., dissenting). An Eighth Amendment retroactivity analysis obviously requires a different analysis than that of the retroactivity of the Sixth Amendment right.
As I emphasized in Asay V, “Applying decisions of fundamental constitutional significance retroactively to defendants in similar circumstances is essential to ‘ensuring fairness and uniformity in individual adjudications.’” 210 So.3d at 32 (Pariente, J., concurring in part and dissenting in part) (quoting Witt v. State, 387 So.2d 922, 925 (Fla. 1980)). Likewise, as Justice Perry explained, Asay is similarly situated to defendants who have received Hurst relief, rendering Asay’s execution constitutionally unfair:
Asay committed two murders on the night of July 17, 1987. His sentence became final on October 7, 1991, when the United States Supreme Court denied certiorari. See Asay v. Florida, 502 U.S. 895, 112 S.Ct. 265, 116 L.Ed.2d 218 (1991). Asay’s nine-to-three jury recommendation that resulted in a death sentence would not be constitutional if Hurst v. Florida applied to him .... Yet, ... another defendant who committed his offense on an earlier date but had his sentence vacated and was later resentenced after Ring, cannot receive the death penalty without the protections articulated in Hurst. Timothy Hurst committed his crimes on May 2, 1990, and was originally sentenced on April 26, 2000, which was final October 21, 2002, a few short months after the decision in Ring. The majority’s application of Hurst v. Florida makes constitutional protection depend on little more than a roll of the dice. This cannot be tolerated.
Id. at 39-40 (Perry, J., dissenting) (footnotes omitted).
For all the legitimate reasons raised by various justices on the Supreme Court at various times, the critical linchpin of the constitutionality of the death penalty is that it be imposed in a reliable and not arbitrary manner.[8] We have explained in detail in our opinion in Hurst why a unanimous jury verdict, required in this State *709 for all criminal convictions, must be required for all death penalty verdicts:
The principle that, under the common law, jury verdicts shall be unanimous was recognized by this Court very early in Florida’s history in Motion to Call Circuit Judge to Bench, 8 Fla. 459, 482 (1859). In the 1885 Constitution, the right to trial by jury was given even more protection by the promise that “[t]he right of trial by jury shall be secured to all, and remain inviolate forever.” Declaration of Rights, § 3, Fla. Const. (1885). And, in 1894, this Court again recognized that in a criminal prosecution, the jury must return a unanimous verdict. Grant v. State, 33 Fla. 291, 14 So. 757, 758 (1894). In 1911, this Court confirmed the unanimity requirement in Ayers v. State, 62 Fla. 14, 57 So. 349, 350 (1911), stating that “[o]f course, a verdict must be concurred in by the unanimous vote of the entire jury.” Almost half a century later, in Jones v. State, 92 So.2d 261 (Fla. 1956), again acknowledging that “[i]n this state, the verdict of the jury must be unanimous,” this Court held that any interference with the right to a unanimous jury verdict denies the defendant a fair trial as guaranteed by the Declaration of Rights of the Florida Constitution. Id. at 261 (On Rehearing Granted). Thus, Florida has always required jury verdicts to be unanimous on the elements of criminal offenses.
In capital cases, Florida’s early laws also indicate that jurors controlled which defendants would receive death. When Florida was still a territory, the penalty for defendants convicted of murder was death by hanging. See Acts of the Legislative Council of the Territory of Florida, An Act for the Apprehension of Criminals, and the Punishment of Crimes and Misdemeanors, § 21 (1822). Under this type of mandatory statute, the jury’s factual findings on the elements of the crime also necessarily served as the elements necessary for imposition of a sentence of death.
Hurst, 202 So.3d at 55 (footnote omitted). In this case, Asay’s sentences of death imposed by 9-3 jury votes are not constitutionally reliable. And, as Justice Perry stated in Asay V, Asay would be in the same position as Timothy Hurst if Hurst applied to him. 210 So.3d at 39-40 (Perry, J., dissenting). For all the reasons set forth in my prior dissents in Asay V and Hitchcock, I dissent from executing this defendant based on a 9-3 recommendation, which if rendered today, would require a life sentence.
CONCLUSION
Executing Asay when he has a pending petition for certiorari at the United States Supreme Court, has not received full discovery on Florida’s newly adopted lethal injection protocol, and, most importantly, was sentenced to death after a jury recommended sentences of death by a vote of 9-3, violates the foundational principles of both the Florida and United States Constitutions. I cannot support the majority’s decision to deny Asay, on the eve of his execution, proper discovery to establish his claim that the procedure to be used in his death constitutes cruel and unusual punishment. Nor can I agree that a decision based in the Sixth Amendment precludes Asay’s ability to assert his constitutional rights under the Eighth Amendment.
Accordingly, I dissent.

. Asay v. State (Asay V), 210 So.3d 1, 7 (Fla. 2016), petition for cert. filed, No. 16-9033 (U.S. Apr. 29, 2017) (pending).

. When the United States Supreme Court reinstated the death penalty in 1976, it explained that a death penalty imposed under procedures that "create[] a substantial risk that it would be inflicted in an arbitrary and capricious manner” violates the Eighth Amendment’s protection against cruel and unusual punishment. Gregg v. Georgia, 428 U.S. 153, 188, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). This requirement against arbitrary imposition of the death penalty recognized the finality of the determination of "whether a human life should be taken.” Id. at 189, 96 S.Ct. 2909. Despite this requirement, Justice Breyer outlined in detail in Glossip the various ways in which the death penalty is arbitrarily imposed, such as by race, gender, geography, resources, and even political pressures. Glossip, 135 S.Ct. at 2760-62 (Breyer, J., dissenting).