921 So.2d 513 (2005)
STATE of Florida, Petitioner,
v.
Henry Maynard BARNUM, Respondent.
No. SC03-1315.
Supreme Court of Florida.
September 22, 2005.
As Revised on Denial of Rehearing February 9, 2006.
*514 Charlie J. Crist, Jr., Attorney General, Robert R. Wheeler, Bureau Chief Criminal Appeals, and Trisha Meggs Pate, Assistant Attorney General, Tallahassee, FL, for Petitioner.
Nancy A. Daniels, Public Defender and Kathleen Stover, Assistant Public Defender, Second Judicial Circuit, Tallahassee, FL, for Respondent.
Kirk N. Kirkconnell and William R. Ponall of Kirkconnell, Lindsey, Snure and Yates, P.A., on behalf of The Florida Association of Criminal Defense Lawyers (FACDL), Winter Park, FL, as Amicus Curiae.
*515 LEWIS, J.
We have for review the decision in Barnum v. State, 849 So.2d 371 (Fla. 1st DCA 2003) ("Barnum II"), which certified conflict with Sweeney v. State, 722 So.2d 928 (Fla. 4th DCA 1998). See Barnum II, 849 So.2d at 374. We have jurisdiction. See art. V, § 3(b)(4), Fla. Const.[1] For the reasons explained below, we quash the First District's decision in Barnum II and approve the Fourth District's decision in Sweeney. Additionally, we find it necessary to reconsider, analyze, and recede from some aspects of our decision in State v. Klayman, 835 So.2d 248 (Fla.2002), which propagated an interpretation of the United States Supreme Court's decision in Fiore v. White, 531 U.S. 225, 121 S.Ct. 712, 148 L.Ed.2d 629 (2001), that in some aspects is unnecessarily expansive, difficult in application, and somewhat at odds with the jurisprudence of this state.

FACTS AND PROCEDURAL HISTORY
The respondent was convicted of armed robbery, attempted first-degree murder of a law enforcement officer, depriving a law enforcement officer of his weapon, and grand theft following a jury trial. See Barnum v. State, 662 So.2d 968, 968-69 (Fla. 1st DCA 1995) ("Barnum I"). Important for purposes of the instant analysis, Barnum was convicted of attempted first-degree murder of a law enforcement officer in violation of section 784.07(3), Florida Statutes (1991). In 1991, section 784.07, "Assault or battery of law enforcement officers, firefighters, or intake officers; reclassification of offenses," provided, in relevant part:
(3) Notwithstanding the provisions of any other section, any person who is convicted of attempted murder of a law enforcement officer engaged in the lawful performance of his duty or who is convicted of attempted murder of a law enforcement officer when the motivation for such attempt was related, all or in part, to the lawful duties of the officer, shall be guilty of a life felony, punishable as provided in s. 775.0825.
§ 784.07(3), Fla. Stat. (1991).[2] At trial, the jury in this case was not instructed with regard to a knowledge element of the crime of attempted first-degree murder of a law enforcement officer. It is undisputed, and the record reflects, that Barnum's defense counsel did not request an instruction that the jury was required to find that Barnum knew the victim was a law enforcement officer; however, it is clear that whether Barnum had knowledge that the victim was a law enforcement officer was a disputed fact at trial.
On direct appeal, Barnum raised five issues, only one of which was addressed by the district court. See Barnum I, 662 So.2d at 969. There, the lower court set aside Barnum's conviction for grand theft of a firearm because he was also sentenced for robbery of the same firearm. See id. The district court affirmed, without discussion, Barnum's remaining convictions. See id. Barnum preserved and asserted the *516 issue of whether knowledge that the victim was a law enforcement officer is an essential element of the offense of attempted first-degree murder of a law enforcement officer, however that issue was not addressed by the district court.
While Barnum's direct appeal was pending, the Fifth District decided Grinage v. State, 641 So.2d 1362 (Fla. 5th DCA 1994), affirmed on other grounds, 656 So.2d 457 (Fla.1995), in which the district court held that knowledge is an essential element of the offense of attempted first-degree murder of a law enforcement officer. Barnum filed a motion for rehearing in the district court, asserting conflict with Grinage and requesting that a certified question centered upon on the knowledge element be presented to this Court. Rehearing was denied. See Barnum I, 662 So.2d at 968.
On December 19, 1997, Barnum, acting pro se, filed a postconviction motion challenging his conviction for attempted first-degree murder of a law enforcement officer. In his motion he argued that he was denied due process and was improperly convicted of attempted murder under the specific statute because the jury had not been instructed nor had it been required to separately find that he had knowledge that the victim was a law enforcement officer. Subsequently, Barnum was appointed counsel, an amended motion was filed asserting error under Thompson v. State, 695 So.2d 691 (Fla.1997),[3] and an evidentiary hearing was held. In Thompson, this Court held that "knowledge of the victim's status as a law enforcement officer is a necessary element of the offense under section 784.07(3), Florida Statutes (1993)." Id. at 693. The trial court denied Barnum's motion, holding that at the time of Barnum's trial, under existing Florida law knowledge was not an essential element of the crime of attempted first-degree murder of a law enforcement officer. Further, the trial court determined that although this Court had held in Thompson that knowledge was an element of the offense, the Fourth District Court of Appeal in Sweeney held that Thompson was not retroactive, and the trial court was required to adhere to the Sweeney holding.
On appeal, the First District Court of Appeal reversed the trial court's determination. The district court declined to follow the Fourth District's decision in Sweeney because the Sweeney court had failed to consider this Court's decision in Moreland v. State, 582 So.2d 618 (Fla.1991). See Barnum II, 849 So.2d at 374. The district court noted that in Moreland, this Court held that fundamental fairness may require the retroactive application of a decision even when a Witt[4] analysis favors finality. See Barnum II, 849 So.2d at 374. The First District reasoned that "if this court had certified conflict with Grinage in Barnum's direct appeal, the supreme court could have considered Barnum's case, decided it in the manner it did Thompson, and remanded for a new trial. We therefore reverse, and certify conflict with Sweeney." Id.
Additionally, the district court explained that in deciding the case before it, the court had considered this Court's decisions in Klayman and Bunkley v. State, 833 So.2d 739 (Fla.2002), in which we held that Florida Supreme Court decisions that "clarify" statutory law apply to all cases, pending or final, while decisions that "change" the law require a Witt analysis to determine if the decision should be applied retroactively. See Barnum II, 849 So.2d at 374. The First District held that it was *517 unable to reconcile Thompson with either category, stating:
Section 784.07(3) did not contain broad terms evincing that the legislature expected the courts to engage in judicial construction, but instead used language that was intended to include a knowledge requirement from the date of the law's enactment, which, under Klayman, would indicate that the court in Thompson was simply clarifying the meaning of the statute. Yet the court also stated that when deciding the applicability of a decision to final cases, a "key consideration" is whether prior case law shows that the lower courts were imposing criminal sanctions under the statute in question where none were intended. Klayman, 835 So.2d at 254; Bunkley, 833 So.2d at 745. As examples of decisions that clarified rather than changed the law, the court cited cases in which it could be readily determined from the record that the convictions or sentences had been imposed contrary to the statutes in question as a matter of law, and did not involve factually disputed matters. Klayman, 835 So.2d at 254, n. 8 & 12. In contrast, it cannot be said in this case that the trial court imposed a criminal sanction where none was intended, because the jury might have convicted Barnum of attempted murder of a law-enforcement officer if it had been properly instructed.
Barnum II, 849 So.2d at 374-75 (footnote omitted).

ANALYSIS

Continued Validity of Thompson

Initially, we address the State's assertion that the decision in Thompson v. State, 695 So.2d 691 (Fla.1997), has been altered by subsequent decisions of this Court, and thus the question of whether that decision is retroactive has been rendered moot. The State's claim is misplaced. The issue presented in Thompson was "whether knowledge of the victim's status as a law enforcement officer is an element of attempted murder of a law enforcement officer under subsection (3) of section 784.07, Florida Statutes (1993)." Thompson, 695 So.2d at 692. There, we held that knowledge of the victim's status as a law enforcement officer is a necessary element of the offense. See id. Importantly, we wrote:
Whether knowledge of the officer's status did or did not exist in a particular case is a factual finding to be left to the jury. While the jury's status as fact finder implicates the notion that a substantive offense has been created under the statute, we need not reach this question to resolve the issue here.
Id. at 693. The Thompson Court determined that knowledge was an element of a violation of section 784.07(3), but refused to classify section 784.07(3) of the Florida Statutes (1993) as either a substantive offense or a sentencing enhancement. See Thompson, 695 So.2d at 693.
Contrary to the State's position, this Court's decisions in Merritt v. State, 712 So.2d 384 (Fla.1998), and Mills v. State, 822 So.2d 1284 (Fla.2002), did not modify the Thompson holding, and the decision in Thompson remains valid, unaltered controlling authority today. In Merritt, this Court held that attempted assault, attempted battery, and attempted aggravated assault and battery of a law enforcement officer are nonexistent offenses. See Merritt, 712 So.2d at 385. In so holding, we wrote: "Section 784.07, Florida Statutes (1995), is an enhancement statute rather than a statute creating and defining any criminal offense." Id. Notably, Thompson was not cited in the opinion, nor was there any issue presented or discussed regarding a knowledge element of *518 the offense of attempted first-degree murder of a law enforcement officer.
Our recent decision in Mills clarified that, even though our reference in Merritt that section 784.07 addresses the concept of enhancement, this statute actually reclassifies the enumerated offenses based upon the status of the victim. See Mills, 822 So.2d at 1287. The issue presented in Mills was whether a defendant, who had been convicted of battery on a law enforcement officer, was eligible for an enhanced sentence pursuant to the habitual offender statute. See id. at 1286. There, the defendant argued that because this Court had defined the statute for battery on a law enforcement officer as an enhancement statute in Merritt, a double enhancement under the habitual felony offender statute violated double jeopardy. See id. We disagreed, explaining that "there is a qualitative difference between a statute which reclassifies enumerated offenses committed against law enforcement officers and enhancement statutes such as the habitual offender statute, `which cut across some or all criminal statutes.'" Id. at 1287 (quoting State v. Brown, 476 So.2d 660, 662 (Fla.1985)). Clearly, in Mills we held that offenses that are reclassified as felonies pursuant to section 784.07 qualify as felony offenses for purposes of the habitual felony offender statute, and double jeopardy principles are not violated. See id. Again, the Thompson decision was not cited in Mills, nor was an issue regarding a knowledge element of the offense of attempted first-degree murder of a law enforcement officer presented or discussed.
Neither Merritt nor Mills modified the holding in Thompson, which requires that a jury determine if the defendant had knowledge of his victim's status as a law enforcement officer. The language in Mills declaring section 784.07 to be a reclassification statute is of no separate importance here. Thompson itself held that section 784.07(3) included a knowledge element, and section 784.07(3)'s classification as either a substantive offense or a sentencing enhancement was totally irrelevant to our determination on that issue. See Thompson, 695 So.2d at 693. Irrespective of whether section 784.07(3) is considered to create a substantive offense, an enhancement provision, or a reclassification statute, Thompson still mandates that a jury is required to determine whether the defendant had knowledge of his victim's status as a law enforcement officer.

Retroactivity of Thompson and Related Due Process Concerns
As has been the case for the past twenty-five years, the standard enunciated in Witt v. State, 387 So.2d 922 (Fla.1980), governs the retroactivity analysis in the instant matter. With due deference to the importance of finality in any system of justice,[5] the Court in Witt determined that only those changes in the law that constitute major constitutional changes, or "jurisprudential upheavals" are applied retroactively. See id. at 929. Acknowledging the fact that the significance of legal developments is largely a case-by-case consideration, the Witt Court stated:

*519 [H]istory shows that most major constitutional changes are likely to fall within two broad categories. The first are those changes of law which place beyond the authority of the state the power to regulate certain conduct or impose certain penalties. This category is exemplified by Coker v. Georgia, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977), which held that the imposition of the death penalty for the crime of rape of an adult woman is forbidden by the eighth amendment as cruel and unusual punishment. The second are those changes of law which are of sufficient magnitude to necessitate retroactive application as ascertained by the three-fold test of Stovall [v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967)] and Linkletter [v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965)]. [N.25] Gideon v. Wainwright, of course, is the prime example of a law change included within this category.
[N.25]. This category of law changes was adapted from Section 2.1(a)(vi) of the ABA Standards Relating to Post-Conviction Remedies (Approv. Draft 1968), which provides in relevant part:
A post-conviction remedy ought to be sufficiently broad to provide relief
(a) for meritorious claims challenging judgments of convictions, including claims:
. . . .
(vi) that there has been a significant change in law, whether substantive or procedural, applied in the process leading to applicant's conviction or sentence, where sufficient reasons exist to allow retroactive application of the changed legal standard;
Id. at 929.
On the opposite end of the spectrum are "evolutionary refinements in the criminal law" which, according to Witt, are not applied retroactively. See id. Changes falling into this category include those "affording new or different standards for the admissibility of evidence, for procedural fairness, for proportionality review of capital cases, and for other like matters. Emergent rights in these categories, or the retraction of former rights of this genre, do not compel an abridgement of the finality of judgments." Id.
The Witt analysis is distinct from, but informed by, the principle articulated by the United States Supreme Court in Fiore v. White, 531 U.S. 225, 121 S.Ct. 712, 148 L.Ed.2d 629 (2001)a case which stands for the proposition that the due process guarantee requires the prosecution to prove each essential element of an offense beyond a reasonable doubt. See id. at 229, 121 S.Ct. 712. If it were not, the "evolutionary refinement" aspect of the Witt nonretroactivity analysis would automatically conflict with Fiore. That the government must prove each element of a criminal offense beyond a reasonable doubt is a bedrock principle of our criminal justice system and one that guides the review of any criminal conviction in this state. However, these due process concerns are somewhat distinct from the general legal questions pertaining to retroactivity, and the principle articulated in Fiore must be applied within the context of the constitutional and jurisprudential law governing Florida's court system.
Regrettably, this Court's decision in State v. Klayman, 835 So.2d 248 (Fla. 2002), and its invocation of statutory analysis with regard to the Legislature "ceding" discretion to the courts for construction, apparently has substantially and unnecessarily confused the legal constructs applicable to the retroactivity analysis and due process concerns under Florida law. Klayman presented the issue as to whether *520 our prior decision in Hayes v. State, 750 So.2d 1 (Fla.1999), in which this Court determined that Florida's drug trafficking statute did not apply to possession of hydrocodone in amounts under a certain threshold, should be applied retroactively. See Klayman, 835 So.2d at 250. In deciding that Hayes applied retroactively, the Klayman Court invoked the United States Supreme Court's holding in Fiore as a basis for determining that any decision of the Florida Supreme Court "clarifying" extant law must be applied in all cases, whether pending or final, that were decided under the same version of that law. See id. at 252. According to the Klayman Court: "A clarification is a decision of this Court that says what the law has been since the time of enactment." Id. at 253. Determination of whether a decision "clarifies" a statute turns first on the language of the decision itself; if the decision is silent or ambiguous, the Court looks to the statute to discern the intent. See id. "Where the Legislature cedes no discretion to the courts either directly or indirectly but instead employs definitive language that ordinarily requires no judicial construction, the Legislature intends that the statute be applied as enacted." Id. (footnotes omitted).
One week after issuing the decision in Klayman, this Court issued its decision in Bunkley v. State, 833 So.2d 739 (Fla.2002) ("Bunkley I"), vacated, 538 U.S. 835, 123 S.Ct. 2020, 155 L.Ed.2d 1046 (2003), a case which required this Court to consider and determine whether to retroactively apply the holding in L.B. v. State, 700 So.2d 370 (Fla.1997). In L.B., this Court considered whether the "common pocketknife" exception to the statutory definition of "weapon" under section 790.001(13) of the Florida Statutes (1997), was unconstitutionally vague. See id. at 371. This Court held that the exception was not unconstitutionally vague and was capable of ascertainment by Florida's juries. We determined that the term applied to the type of knife in which the blade folds into the handle permitting it to be carried in one's pocket. See id. at 372. In determining that the exception applied to the knife carried by L.B., the Court noted an opinion of the Attorney General from 1951 stating that a pocketknife with a blade of four inches or less was a "common pocketknife." See id. at 373.
In Bunkley I, this Court refused to apply the decision in L.B. retroactively to reverse Bunkley's conviction for armed burglary on the basis that the knife he carried during the burglary of a closed, unoccupied restaurant, which had a blade of 2 1/3 to 3 inches in length, fell within the "common pocket knife" exception. See Bunkley I, 833 So. at 746. This Court applied what can only be called a hybridization of the Klayman and Witt standards,[6] determining that the decision in L.B. was not a "jurisprudential upheaval" requiring retroactive application, but an "evolutionary refinement," as evidenced by the fact that the statute ceded discretion to the courts to determine the meanings of "dangerous weapon" and "common pocketknife" in the burglary and weapon statutes since such terms would require judicial construction to provide a meaningful basis for sanction. See id. at 745. With regard to the impact of Fiore on the analysis, the Court in Bunkley I simply stated that the body of precedent regarding "clarifications" and the decision in Fiore itself had no application in Florida law. See id. at 744 & n. 12.
*521 Thus, within a period of one week, the Court issued two opinions articulating slightly different standards for adjudging retroactivity and reaching divergent conclusions, with Klayman holding that Fiore required relief from a final district court decision and Bunkley I holding that Fiore did not apply to cause retroactive application. This apparent irreconcilable conflict resulted, at least in part, from neither decision squarely addressing or discussing the manner in which the status of Florida law is defined at the time of conviction in cases where a Florida district court has clearly decided with finality a principle or concept of law in a particular way and the Florida Supreme Court subsequently considers and rules upon the same issue in a totally opposite manner. Any differing results could semantically be characterized as a "change" and the "evolutionary refinement" nonretroactivity position of Witt render that decision totally invalid.
Most certainly, it is now clear that the due process concerns addressed in the United States Supreme Court's decision in Fiore apply to Florida cases under review by this Court, and this Court erred in Bunkley I to the extent we suggested or implied otherwise. See Bunkley v. Florida, 538 U.S. 835, 838, 123 S.Ct. 2020, 155 L.Ed.2d 1046 n* (2003). The essential lesson from Fiore is that a conviction runs afoul of due process guarantees if, at the time it was rendered, the activity in which the defendant was engaged was not a crime. Thus, as stated by the United States Supreme Court in its decision in Bunkley,[7] "[t]he proper question under Fiore is not whether the law has changed," but rather what the state of the law was at the time of the defendant's conviction. Id. at 840, 123 S.Ct. 2020. Instead of squarely addressing the Fiore principle, Klayman created a "clarification versus change" construct based on this Court's interpretation of whether the Legislature had afforded any interpretive discretion to reviewing courts in the governing statute. While championed under a banner of simplicity, that distinction appears to be confusing and unworkable in practice because it ignores the fact that in cases of statutory construction, "the law" is comprised of the statute plus decisional caselaw interpreting that statute. Further, a "clarification" or "change" may seem at times to be interchangeable concepts with the Florida structure in place. Thus, "the law" at the time a petitioner is convicted must be defined with regard to the manner in which and the extent to which the multiple district courts of appeal have determined the scope, application, and operation of the governing statute.
Understanding this conclusion requires us to review the United States Supreme Court's decision in Fiore. There, Fiore was convicted of violating a Pennsylvania statute prohibiting the operation of a hazardous waste facility without a permit. See Fiore, 531 U.S. at 226, 121 S.Ct. 712. Although Fiore had a permit, the state argued that he had deviated so dramatically from the permit's terms that he had violated the statute. See id. After Fiore's conviction became final, the Pennsylvania Supreme Court interpreted the statute for *522 the first time in Commonwealth v. Scarpone, 535 Pa. 273, 634 A.2d 1109 (1993). David Scarpone was Fiore's codefendant and the two were convicted of the same crime at the same time. See Fiore, 531 U.S. at 227, 121 S.Ct. 712. In that case, the Pennsylvania Supreme Court held that Scarpone's conduct was not within the ambit of the statute, reasoning that one who deviates from the terms of a permit is not operating without a permit as required by the statute. See id.
Unsuccessful in his attempts to have his own conviction set aside, Fiore commenced a federal habeas corpus action. See id. The district court granted the writ, but the Third Circuit Court of Appeals reversed, determining that the Pennsylvania Supreme Court had announced a new rule of law in Scarpone which was inapplicable to Fiore's already final conviction. See id. The United States Supreme Court granted certiorari to decide whether Fiore's conviction violated the Federal Due Process Clause. See id.
In reviewing the case, the United States Supreme Court found it necessary to certify a question to the Pennsylvania Supreme Court, asking whether the statutory interpretation announced in Scarpone was the correct interpretation of the law at the time Fiore's conviction became final. See id. at 228, 121 S.Ct. 712. In response, the Pennsylvania Supreme Court explained that its interpretation was not a new rule of law, but merely a clarification of the plain language of the statute, and, as such, represented the proper statement of the law on the date that Fiore's conviction became final. See id. Based upon the Pennsylvania Supreme Court's answer to the certified question, the United States Supreme Court held that the question presented in its review of Fiore was not one of retroactivity, but instead, "whether Pennsylvania can, consistently with the Federal Due Process Clause, convict [the petitioner] for conduct that its criminal statute, as properly interpreted, does not prohibit." Id.
The High Court concluded that Fiore's conviction violated due process safeguards because after the litigation in his case was final, the Pennsylvania Supreme Court determined that failure to possess a permit was, at the time of his conviction, a basic element of the crime for which the petitioner was convicted. See id. at 229, 121 S.Ct. 712. The State's failure to prove that Fiore lacked the required permit indeed the State had conceded that Fiore possessed the required permitrendered Fiore's conviction unconstitutional. See id.
Thus, Fiore requires vindication of due process guarantees by ensuring that each essential element of an offense at the time a conviction becomes final is proved beyond a reasonable doubt. As stated in Fiore, and echoed again by the United States Supreme Court in Bunkley, the pertinent question from a due process perspective is the state of the law at the time of the petitioner's conviction. See Bunkley, 538 U.S. at 840, 123 S.Ct. 2020. Through constitutional structure and as expressed in numerous decisions of this Court, the district courts have been designed to be the final appellate courts in the state of Florida for the purpose of this analysis. See Jenkins v. State, 385 So.2d 1356, 1359 (Fla.1980); Stanfill v. State, 384 So.2d 141, 143 (Fla.1980) ("The decisions of the district courts of appeal represent the law of Florida unless and until they are overruled by this Court....").[8] Moreover, *523 in the absence of interdistrict conflict, decisions of the district courts represent the law of the state, binding all Florida trial courts. See Pardo v. State, 596 So.2d 665, 666 (Fla.1992); see also Gore v. Harris, 772 So.2d 1243, 1258 (Fla.2000) ("This Court has determined the decisions of the district courts of appeal represent the law of this State unless and until they are overruled by this Court, and therefore, in the absence of interdistrict conflict, district court decisions bind all Florida trial courts."), rev'd on other grounds, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000).
A decision of a Florida district court of appeal is final for these purposes because in the absence of conflict with another district court decision or a decision of this Court, or certification of an issue by a district court, a United States Circuit Court of Appeals, or the United States Supreme Court, or some other Florida constitutional basis, this Court has no jurisdiction to simply and routinely review the district court decisions.[9] It is beyond dispute that this Court is without power to simply assume jurisdiction in a case to correct what we perceive as error, even if the issue appears to be important or involves the construction of a criminal statute. Thus, a decision of a district court construing a statute can remain in effect indefinitely.
Clearly, continued adherence to the Klayman "clarification versus change" framework and searching for a Legislative delegation of interpretive power to the courts would cause, in operation, conflict *524 with regard to our constitutional structure and the constitutionally mandated jurisdiction of this Court. Moreover, propagation of the decision in Klayman is certainly not compelled by the United States Supreme Court's decisions in Fiore or Bunkley. As we must recognize, the United States Supreme Court has acknowledged that the pertinent question under Fiore concerns the state of the law at the time of the conviction. See Bunkley, 538 U.S. at 840, 123 S.Ct. 2020. In reviewing this Court's decision in Bunkley I, the United States Supreme Court stated:
Ordinarily, the Florida Supreme Court's holding that L.B. constitutes a change inrather than a clarification ofthe law would be sufficient to dispose of the Fiore question. By holding that a change in the law occurred, the Florida Supreme Court would thereby likewise have signaled that the common pocketknife exception was narrower at the time Bunkley was convicted.
Here, however, the Florida Supreme Court said more. It characterized L.B. as part of the "century-long evolutionary process." 833 So.2d, at 745. Because Florida law was in a state of evolution over the course of these many years, we do not know what stage in the evolutionary process the law had reached at the time Bunkley was convicted. The Florida Supreme Court never asked whether the weapons statute had "evolved" by 1989 to such an extent that Bunkley's 2 1/2to 3inch pocketknife fit within the "common pocketknife" exception. The proper question under Fiore is not just whether the law changed. Rather, it is when the law changed.
Bunkley, 538 U.S. at 841-42, 123 S.Ct. 2020.[10] The due process concerns at root in Fiore and applied in Bunkley are satisfied by the necessary operation of Florida constitutional and decisional law, which clearly provide that the reversal of a district court interpretation of a statute by this Court necessarily changes the law as it existed at the time of a defendant's conviction. The change may result from a multitude of reasons but it would still be change nonetheless. We so held upon remand from the United States Supreme Court in Bunkley v. State, 882 So.2d 890, 897 (Fla.2004), cert. denied, 543 U.S. 939, 125 S.Ct. 939, 160 L.Ed.2d 822 (2005) ("Bunkley II").

Application of the Witt Standard
Having determined that the question of the retroactivity of decisions should be controlled solely by Witt, we now turn to the issue presented in the instant action, namely the retroactivity of this Court's decision in Thompson. To be applied retroactively, Thompson must satisfy the three-part Witt test. First, it must emanate from this Court or the United States Supreme Court; second, the decision must be constitutional in nature; and third, it must constitute a development of fundamental significance. See Witt, 387 So.2d at 931. Clearly, the first prong is satisfied, as Thompson was a decision of this Court. The remaining two prongs are, however, not met, and therefore we hold that Thompson is not retroactive.
*525 In Sweeney v. State, 722 So.2d 928 (Fla. 4th DCA 1998), the Fourth District Court of Appeal held that Thompson should not be applied retroactively because it failed to satisfy the second prong of the Witt test. See id. at 930. There, the court held that Thompson "merely applied principles of statutory construction in holding that the statute implicitly requires a factual finding of the victim's status; it did not create nor abrogate any substantive rights or offense[s]," and therefore it was not constitutional in nature. Id. at 931. The Sweeney court's holding was correct with regard to the Witt analysis.
In State v. Callaway, 658 So.2d 983 (Fla. 1995), receded from on other grounds by Dixon v. State, 730 So.2d 265 (Fla.1999), this Court held that the decision in Hale v. State, 630 So.2d 521 (Fla.1993), satisfied all three prongs of the Witt test and should therefore be applied retroactively. In Hale, we held that there was no statutory authority that allowed trial courts to impose consecutive habitual felony offender sentences for multiple offenses arising out of the same criminal episode. See Callaway, 658 So.2d at 985. The Callaway Court determined that the second prong of Witt was satisfied because the "imposition of consecutive habitual felony offender sentences for offenses arising out of a single criminal episode could not withstand a due process analysis ... [and] ... the decision in Hale significantly impacts a defendant's constitutional liberty interests." Id. at 986 (citation omitted).
Similarly, in State v. Stevens, 714 So.2d 347 (Fla.1998), we held that the decision in State v. Iacovone, 660 So.2d 1371 (Fla. 1995), satisfied all three prongs of the Witt test and should be applied retroactively. See Stevens, 714 So.2d at 348. In Iacovone, this Court held that sections 784.07 and 775.0825 of the Florida Statutes (Supp. 1988), relating to sentencing for attempted murder of a law enforcement officer were not applicable to attempted second- and third-degree murder, limiting the statutes' scope to attempted first-degree murder. See id. at 347-48. In Iacovone, we noted that applying the statutes' mandatory life sentences for attempted second- and third-degree murder would lead to irrational results because the completed crimes of second- and third-degree murder were subject to lesser penalties. See id. at 348 n. 3. Applying the Witt test to the Iacovone decision, we held that Iacovone was constitutional in nature because "imposition of a hefty criminal sentence pursuant to a patently `irrational' sentencing scheme `could not withstand a due process analysis' of any sort." Id. at 348 (quoting Callaway, 658 So.2d at 986).
The Thompson decision, holding that section 784.07(3) contains a knowledge element, does not implicate due process concerns present in both Callaway and Stevens. As noted in Sweeney, Thompson utilized principles of statutory construction, not a constitutional analysis. The due process concerns present in both Callaway and Stevens related to lengthy sentences that this Court subsequently determined were not intended by the statute. The trial courts had incorrectly interpreted the statutes and sentenced the defendants without statutory authority, i.e., their sentences were not what the Legislature intended. The same cannot be said in the instant action. Here, the respondent was convicted of attempted first-degree murder of a law enforcement officer, a life felony with a twenty-five year mandatory minimum under sections 784.07(3) and 775.0825 of the Florida Statutes (1991). The trial court sentenced him to twenty-seven years' imprisonment. Unlike the defendants in Callaway and Stevens, Barnum was not sentenced against Legislative intent; in fact, he was sentenced precisely according to Legislative intent. Additionally, *526 in Callaway and Stevens, but for the erroneous sentencing by the trial courts, the defendants unquestionably would not have been sentenced to the same lengthy periods of incarceration. Again, the same cannot be said here. Pursuant to sections 777.04(4)(a) and 775.082(3)(b) of the Florida Statutes (1991), the penalty for attempted murder in 1991 was "a term of imprisonment not exceeding 30 years." § 775.082(3)(b), Fla. Stat. (1991). Although Barnum would not have been subject to the twenty-five year mandatory minimum, it is clear that he would still have had the potential for a substantial sentence. Clearly, the due process concerns of Callaway and Stevens are not the prevalent consideration in the instant action. Therefore, we hold that Thompson does not satisfy the second prong of the Witt testthat the decision sought to be applied is constitutional in nature.
Similarly, Thompson does not satisfy the third prong of the Witt test because it is not a decision of fundamental significance. Witt dictates that those decisions constituting "evolutionary refinements" and not "jurisprudential upheavals" should not be applied retroactively. See Witt, 387 So.2d at 929. Thompson was a conventional, nonconstitutional concept requiring that courts find a knowledge element in the statutory scheme. It was not a decision such as Coker v. Georgia, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977), where the United States Supreme Court held that "a sentence of death is grossly disproportionate and excessive punishment for the crime of rape." Id. at 592, 97 S.Ct. 2861. Thompson merely provided that section 784.07(3) contains a knowledge element; it did not "place beyond the authority of the state the power to regulate certain conduct or impose certain penalties." Witt, 387 So.2d at 929. In a similar manner, Thompson was not a major constitutional change of law, such as Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). As Thompson was not a major constitutional change, it will not be applied retroactively.

Fundamental Fairness Inquiry
The district court below did not conduct a retroactivity analysis on the basis of Witt, but instead applied this Court's decision in Moreland v. State, 582 So.2d 618 (Fla.1991), determining that the principle of fundamental fairness which mandated retroactive application in that case also controlled the instant matter. See Barnum, 849 So.2d at 374. The First District's reliance upon Moreland was misplaced because the facts presented in Moreland are clearly distinguishable from those we consider here.
Moreland addressed the issue of the retroactivity of this Court's decision in Spencer v. State, 545 So.2d 1352 (Fla.1989). Spencer held that a 1980 administrative order of the Fifteenth Judicial Circuit dividing Palm Beach County into eastern and western jury districts was unconstitutional because it excluded blacks from the eastern district's jury pool. See Moreland, 582 So.2d at 619. As a result, this Court reversed a defendant's first-degree murder conviction and death sentence. See id. While Spencer was pending in this Court, Moreland was tried for first-degree murder. He challenged the constitutionality of the administrative order, but his challenge was rejected. See id. Moreland was convicted of first-degree murder and sentenced to life imprisonment. See id. On direct appeal, Moreland again challenged the constitutionality of the administrative order, but the district court simply affirmed his conviction and sentence without opinion. See id.
*527 After Spencer was released by this Court, Moreland filed a postconviction motion, arguing that Spencer should be applied retroactively, and that his conviction and sentence should be vacated. See id. The trial court conducted a Witt analysis and held that Spencer was retroactive. The district court, however, disagreed, and held that Spencer was not retroactive under Witt. See id. On review, we agreed that Spencer should not be applied retroactively on the basis of Witt, but nonetheless held that Spencer should be applied retroactively to Moreland.
Our justification for retroactive application there was fundamental fairness. We held that had Moreland been sentenced to death rather than life, his direct appeal would have been heard by the Supreme Court rather than the Fourth District Court of Appeal, and he would have obtained the same result as Spencer and other defendants whose convictions and sentences were vacated due to the unconstitutional administrative order. See id. at 620. There, we wrote: "It would be fundamentally unfair to deny Moreland the relief provided by Spencer merely because his sentence directed his appeal to a court other than this one." Id. Importantly, we noted that Moreland had claimed in the trial court and on direct appeal that the administrative order was unconstitutional, and that "[h]ad he not done so he would not be entitled to relief." Id. at 620 n. 3; see also Owen v. Crosby, 854 So.2d 182, 190-91 (Fla.2003) (holding that Owen had not challenged jury selection at trial and was therefore not entitled to relief under Moreland).
Applying Moreland to the instant action, the district court determined: "[I]f this court had certified conflict with Grinage in Barnum's direct appeal, the supreme court could have considered Barnum's case, decided it in the manner it did Thompson, and remanded for a new trial." Barnum, 849 So.2d at 374. In Grinage, the Fifth District had held that "before [a defendant] can be convicted of attempting to murder a police officer engaged in the lawful performance of his duty, the State must allege and prove that he knew his victim was a police officer." Grinage, 641 So.2d at 1364. We accepted jurisdiction in Thompson on the basis of conflict between Grinage and Thompson v. State, 667 So.2d 470 (Fla. 3d DCA 1996), where the Third District held that section 784.07(3) was only a sentencing enhancement and did not require the defendant to have knowledge that the victim was a law enforcement officer. See Thompson, 695 So.2d at 691-92.
The First District's reliance upon Moreland and its conclusion that fundamental fairness necessitates retroactive application of Thompson is in error. The instant action differs from Moreland in several respects. First, we clearly held in Moreland that had the defendant not asserted at trial that the administrative order was unconstitutional, he would not have been entitled to relief based upon the retroactive application of Spencer. See Moreland, 582 So.2d at 620 n. 3. Here, it is uncontested and the record reflects that Barnum did not argue that the jury should be instructed on a knowledge element, nor did he object to the court's jury instructions, despite the dispute regarding whether Barnum knew the victim was a law enforcement officer.[11]
*528 Second, in Moreland, we noted that had the defendant there received the death sentence, as opposed to a sentence of life imprisonment, his direct appeal would have been in this Court, rather than the district court. Therefore, he was entitled to the benefit of what unquestionably would have occurred had his direct appeal been to this Court. See id. at 620. In the instant action, the First District assumed that had that court certified conflict with Grinage in 1995, this Court would have accepted jurisdiction and decided Barnum's case as it eventually did Thompson's in 1997. See Barnum, 849 So.2d at 374. However, even if the First District had certified the conflict, there would have been no guarantee that this Court would have accepted jurisdiction. Unlike the mandatory review in death penalty cases, a district court's certification of conflict does not present this Court with mandatory jurisdiction. See art. V, § 3(b)(4), Fla. Const. Therefore, it is not beyond dispute, as it was in Moreland, that we would have reviewed Barnum's case.
Further, in Moreland, we had the benefit of not only our decision in Spencer, but also the benefit of at least two other decisions in which we had reached the same result. See Moreland, 582 So.2d at 620. Thus, it could safely be inferred from those three decisions that Moreland's outcome would have been the same had we had the opportunity to consider the issue. The same cannot be said in Barnum's case. Although this Court held in Thompson that knowledge is an element of section 784.07(3), we have not addressed the issue in any other decision. There is no sufficient guarantee, as there was in Moreland, that had we accepted jurisdiction in 1995, we would have decided the issue the same way as we eventually did in Thompson and would have likewise granted Barnum relief.
In Witt, this Court wrote: "The doctrine of finality should be abridged only when a more compelling objective appears, such as ensuring fairness and uniformity in individual adjudications." Witt, 387 So.2d at 925. That concept, in part, led to the outcome in Moreland. See Moreland, 582 So.2d at 619-20. However, Moreland presented a unique circumstance directly resulting from the dual-track system for appeals of first-degree murder convictions, which places appeals from death sentences before this Court and appeals from sentences of life imprisonment before the district courts. Barnum's is the more common situation in which district courts reach conflicting interpretations, and in reviewing only one of the decisions, this Court resolves the conflict in favor of the defendant. The principle established in Moreland does not apply in this scenario.

CONCLUSION
For the stated reasons, we approve the decision in Sweeney and quash the First District's decision in Barnum. Pursuant to Witt, our holding in Thompson is not retroactive. Further, since we have now squarely held that all decisions of this Court disagreeing with a statutory construct previously rendered by a district court constitute "changes" in the applicable law from the law at the time of conviction, we recede from the "clarification/change" scheme and the "ceding" of discretion analysis voiced in Klayman and reiterate that retroactivity will be adjudged solely through operation of the *529 Witt standard with an overlay of the Fiore due process considerations.
It is so ordered.
WELLS, CANTERO, and BELL, JJ., concur.
PARIENTE, C.J., concurs in result only with an opinion, in which ANSTEAD and QUINCE, JJ., concur.
QUINCE, J., concurs in result only with an opinion, in which PARIENTE, C.J., and ANSTEAD, J., concur.
PARIENTE, C.J., concurring in result only.
I agree that Barnum is not entitled to have his sentence reduced to eliminate the law enforcement victim enhancement under Fiore v. White, 531 U.S. 225, 121 S.Ct. 712, 148 L.Ed.2d 629 (2001), Moreland v. State, 582 So.2d 618 (Fla.1991), or Witt v. State, 387 So.2d 922 (Fla.1980). I further agree with the majority's rationale for holding Moreland and Witt inapplicable. My concurrence is in result only because I cannot agree that the due process principles vindicated in Fiore can be satisfied in Florida solely by application of the Witt test, which is the effect of the majority opinion.
I would continue to fully apply both Witt and Fiore, with the critical limiting caveat that Fiore applies only in cases in which a clarification of the law establishes that the defendant was convicted for conduct that does not constitute a crime. In addition, I would distinguish clarifications subject to Fiore from changes in the law subject to Witt as follows. A first-time interpretation by this Court of a statutory term would be a clarification subject to Fiore when we address an issue on which there is no "law of the state" because the district courts either have not addressed the issue or are in conflict, or when we adopt a district court interpretation on which there is no conflicting precedent. A decision by this Court interpreting a statute would be a change in the law subject to the Witt retroactivity test when the decision is contrary to the "law of the state" established either by our own precedent or precedent from the district courts on which there is no interdistrict conflict.
Consistent with this Court's decision in Thompson v. State, 887 So.2d 1260 (Fla. 2004),[12] I believe that Fiore operates outside of, and in addition to, the retroactivity analysis of Witt. In Thompson, we rejected an argument for retroactive relief under Witt on two grounds. First, we noted that the decision the petitioner sought to have applied to his conviction, Huss v. State, 771 So.2d 591 (Fla. 1st DCA 2000), was by a district court rather than this Court or the United States Supreme Court, contrary to the requirements of Witt. Second, we concluded that the decision concerned a change in statutory law requiring two prior convictions of driving with knowledge that one's license is suspended in order to make a third or subsequent conviction a felony, whereas Witt concerns retroactivity of changes in the decisional law. See Paul Thompson, 887 So.2d at 1263-64. We then conducted a Fiore analysis, concluding that Thompson's conviction constituted a denial of due process of law because "the State did not and could not prove that Thompson had three prior convictions for the offense [of] driving with knowledge that his license had been canceled, suspended or revoked." Id. at 1266. Our decision in Paul Thompson fits the criteria for relief under Fiore set out above because *530 this Court in effect adopted the district court's interpretation of the statute, making it a first-time clarification by this Court on an issue on which there were no district court decisions to the contrary.
The majority does not address Paul Thompson, which presumably remains good law because it involves the approval rather than "the reversal of a district court interpretation." Majority op. at 524. However, the latter scenario arises much more frequently, as it did in State v. Klayman, 835 So.2d 248 (Fla.2002), in which we also granted relief under Fiore. The majority implicitly recedes from Klayman. I disagree and would reaffirm Klayman's importance.
In Klayman, the Court applied Fiore to hold that this Court's decision in Hayes v. State, 750 So.2d 1 (Fla.1999), required that any conviction of trafficking in hydrocodone be vacated, regardless of whether it was pending on appeal or final, if the drug contained no more than 15 milligrams of hydrocodone per dosage unit. Under that interpretation, the defendant in Klayman, as in Hayes, was entitled to dismissal as a matter of law because the crime of drug trafficking did not occur. See Klayman, 835 So.2d at 251 (identifying issue as presenting a pure question of law). Hayes clarified statutory terms to be applied by the courts, and was applicable to Klayman's final conviction pursuant to the due process requirements of Fiore.
As I have previously stated, I would dispense with Klayman's distinction concerning decisions on statutes that cede interpretive discretion to the courts from those that do not as a dividing line for the application of Fiore. See Bunkley v. State, 882 So.2d 890, 926 (Fla.2004) (Bunkley III) (Pariente, J., dissenting) (concluding that disparate results in Bunkley and Klayman "cannot be justified by any distinction between statutes that cede discretion to the courts and those that employ precise language"), cert. denied, 543 U.S. 1079, 125 S.Ct. 939, 160 L.Ed.2d 822 (2005).[13] I would therefore recede from the portion of Klayman that distinguishes decisions on the basis of whether the statutes they construe cede interpretive discretion to the courts. On this the majority and I agree.
However, I would adhere to the core holding in Klayman that a decision by this Court clarifying the statutory law must, pursuant to Fiore, be applied to final cases in which the clarification demonstrates that the defendant's conduct "was never intended by the Legislature to be a crime." 835 So.2d at 254. This is an important limitation, and restricts Fiore to situations that rarely occur. But when these situations do arise, the due process imperative of fairness that drove the holding in Fiore demands relief.
Answering the certified question in this case, I would limit relief under Klayman and Fiore to cases in which the clarification does not require resolution of a disputed factual matter. Our 2004 decision in Paul Thompson, which concerned the driving while license suspended statute, is an example of the proper application of Fiore, because the State could not prove the requisite prior convictions that are an essential element of the felony offense. See 887 *531 So.2d at 1266. Thus, the crime was a misdemeanor and not the felony version of driving with a suspended license. See id. at 1266 n. 7.
The majority in this case attempts to synthesize the tests set out in Fiore and Witt, but in the process leaves very few decisions, if any, subject to Fiore's rule governing clarifications. Under the majority's view, there could be no relief under Fiore when this Court has clarified the law after intermediate appellate courts reached differing conclusions on how a statute is to be interpreted, and those differing interpretations could result in a defendant being convicted of a crime in one district for conduct that another district court of appeal has determined is not a crime. The majority essentially adopts Justice Wells' view that this Court can only change, but never clarify, the law of Florida when it overturns or disapproves a district court decision. See Bunkley III, 882 So.2d at 917 (Wells, J., concurring) ("It is simply incorrect under Florida's court structure to conclude that a decision from this Court on a point of law that is contrary to a district court decision does not change that law."). As Justice Anstead noted in his dissenting opinion in Bunkley III, this is an "extraordinary assertion" that unconstitutionally extends to district courts authority beyond their geographic boundaries. 882 So.2d at 918 (Anstead, C.J., dissenting). In my dissenting opinion in that case, I noted that "the existence of mid-level courts does not diminish the authority of the state's highest court to interpret the law, resolve conflicts among lower courts, and determine issues of constitutional stature or statewide importance." Id., at 925 (Pariente, J., dissenting).
In drastically limiting Fiore, which involved Pennsylvania courts' construction of state law, the majority relies on the fact that the Pennsylvania Supreme Court's discretionary review authority is broader than ours. See majority op. at 19 n.18. Therefore, following the majority's logic, because decisions by midlevel appeals courts in Pennsylvania are widely reviewable by that state's supreme court, those decisions are not the "law of the state" to the same extent as the decisions of intermediate appellate courts in Florida. This view is incorrect for two reasons. First, the differences on which the majority relies the number of votes needed for discretionary review, the grounds for review, and whether "pass-through" jurisdiction requires certification by the lower court are not so great as to justify such elevated status for Florida district court decisions. For example, some of the same considerations limiting our discretionary jurisdiction, such as conflict among the lower courts, are included in the Pennsylvania appellate rules as guides to the exercise of discretionary jurisdiction by the state supreme court. See Pa. R. App. P. 1114 (Considerations Governing Allowance of an Appeal). Second, independently of how a state supreme court acquires discretionary jurisdiction, once the court has a case it is that court's responsibility to settle questions of statutory interpretation when they arise and provide the definitive construction of a state statute. Unless settled precedent from the midlevel appellate courts had held to the contrary, the state supreme court's pronouncement will constitute a clarification rather than a change in state law.
Moreover, the narrowing of this Court's jurisdiction in the 1980 amendment to article V of the Florida Constitution was to relieve an overburdened docket in order to allow the Court to focus on its supervisory role over the appellate courts to promote uniformity of the law, and not to weaken our authority. See Jenkins v. State, 385 So.2d 1356, 1359 (Fla. 1980). As we explained in Jenkins, the district courts were *532 established to preserve the Florida Supreme Court's `function[ ] as a supervisory body in the judicial system for the State, exercising appellate power in certain specified areas essential to the settlement of issues of public importance and the preservation of uniformity of principle and practice." Id. at 1357-58.
Fiore itself is an illustration of a state supreme court's resolution of conflicting decisions in the lower courts via a clarification that must be applied equally to all convictions, final or not, to comport with due process of law. In Commonwealth v. Scarpone, 535 Pa. 273, 634 A.2d 1109 (Pa. 1993), the Pennsylvania Supreme Court resolved a conflict between two different intermediate appellate courts on interpretation of a state criminal statute. See id at 1122. Answering the U.S. Supreme Court's certified question in Fiore, the state supreme court held that its ruling in Scarpone "merely clarified the plain language of the statute." Fiore v. White, 757 A.2d 842, 848-49 (Pa. 2000). The U.S. Supreme Court held that due process required application of this clarification to Fiore's conviction despite its finality. Fiore, 531 U.S. at 228-29, 121 S.Ct. 712. This Court's resolution of conflicting district court decisions in a first-time clarification of a statute should not be exempted from the due process requirements of Fiore.
Klayman demonstrates why a district court decision in Florida generally should not be regarded as the law of the state, because it is a textbook example of an issue that simmers for a period of time in the district courts before reaching us. The underlying issue was whether a defendant could be convicted of drug trafficking for possessing tablets that each contained no more than 15 milligrams of hydrocodone when the total amount of the prohibited substance in all the tablets surpassed the 4-gram threshold of the trafficking statute. The first appellate court to interpret the pertinent language in the trafficking statute was the Fifth District Court of Appeal in State v. Baxley, 684 So.2d 831 (Fla. 5th DCA 1996), review denied, 694 So.2d 737 (Fla.1997). There the Fifth District determined that the amount of hydrocodone in all of the tablets could be aggregated to reach the trafficking threshold. See id. at 833. The decision in Baxley became final when this Court denied review. Our denial meant either that we did not find a basis for jurisdiction or that we declined to exercise our discretionary jurisdiction. Our denial cannot be construed to mean that we agreed with Baxley.
Did that make Baxley the law of the State? Only in the sense that a trial court anywhere in the state would have had to follow Baxley until a contrary decision appeared. See Pardo v. State, 596 So.2d 665, 666 (Fla.1992) ("[I]n the absence of interdistrict conflict, district court decisions bind all Florida trial courts."); see also Bunkley III, 882 So.2d at 918 (Anstead, C.J., dissenting) (noting that Supreme Court's authority to direct trial courts to follow the decision of another district court where there is no decision in their districts is "solely for administrative convenience").
A contrary decision soon appeared. A short time after Baxley, the First District Court of Appeal reached the opposite conclusion, determining that it was the amount of controlled substance per dosage unit and not the aggregate amount or weight that determined whether a defendant could be prosecuted for drug trafficking. See State v. Holland, 689 So.2d 1268, 1270 (Fla. 1st DCA 1997). The First District certified conflict with Baxley, but the State did not seek to invoke our jurisdiction. The Second District Court of Appeal followed Holland in State v. Perry, 716 So.2d 327, 327 (Fla. 2d DCA 1998), in *533 affirming the dismissal of three counts of trafficking in hydrocodone. The Second District also certified conflict with Baxley. This Court initially granted and then dismissed review without explanation. See State v. Perry, 727 So.2d 911 (Fla.1998) (granting review); State v. Perry, 744 So.2d 457 (Fla.1999) (dismissing review).
Finally, the Fourth District Court of Appeal in Hayes sided with the Fifth District's view in Baxley, reversed an order dismissing an information charging drug trafficking, and certified conflict with Holland and Perry. See State v. Hayes, 720 So.2d 1095, 1097 (Fla. 4th DCA 1998), quashed, 750 So.2d 1 (Fla.1999). On this occasion, we retained jurisdiction and agreed with the First and Second Districts that no crime of drug trafficking existed for possession of hydrocodone in tablets with dosage units of no more than 15 milligrams. We directed that the trial court order dismissing the trafficking charge be affirmed. See Hayes v. State, 750 So.2d 1, 5 (Fla.1999).
Before we decided Hayes, there was no settled law of Florida on the issue of statutory constructionhow to determine the amount of hydrocodone for purposes of the drug trafficking statutedecided in that case. Instead, the law in Florida was in a state of flux, as evidenced by the conflicting decisions discussed above. The law remained unsettled through the time that Klayman's conviction became final and until this Court spoke and unanimously clarified the law of Florida in Hayes. To say that either the decision of the First District in Holland or the contrary decision of the Second District in Baxley set out "the law of the state" on the issue in the same manner as the Pennsylvania Supreme Court decision at issue in Fiore, 531 U.S. at 228, 121 S.Ct. 712, would be incorrect.
We should not categorically preclude Fiore relief in situations such as Klayman in which our clarification of the law results in a defendant being convicted for conduct that does not constitute a crime. Controversies over interpretations of statutes often percolate in the district courts over a period of time, and we have discouraged district courts from certifying as questions of great public importance first-time interpretation of statutes since we prefer to see these controversies develop in the district courts to enable us to make the most informed decisions. During this process, district courts may dispose of the issue in some of the cases by per curiam affirmances without opinion, which precludes further review. Even in those cases in which district courts address the issue in written opinions, the issue generally does not reach us unless and until there is certified interdistrict conflict or express and direct interdistrict conflict, as in Hayes, which Klayman applied to final convictions pursuant to Fiore.
But our preference not to address questions on the proper interpretation of a criminal statute when they first arise in Florida law should not work to defendants' disadvantage once the issue is resolved by us. Otherwise, defendants in some districts would remain convicted for conduct that does not constitute a crime under the statute as interpreted in other districts and ultimately by this Court. Klayman is a case in point. Until our clarification in 1999 of the drug trafficking statute, defendants in 1997 and 1998 convicted of possessing an identical amount of hydrocodone tablets in the Fourth and Fifth Districts would be subjected to prosecution for possessing a Schedule II substance subject to a mandatory minimum term of imprisonment of 25 years and a mandatory fine of $500,000. See § 893.135(1)(c)(1)(c), Fla. Stat. (1997). At the same time, in the First and Second Districts those convicted of possessing the *534 same number of identical tablets could not be convicted under the trafficking statute, and would be guilty only of unauthorized possession of a Schedule III substance, a third-degree felony punishable by a term of imprisonment not to exceed five years. See §§ 775.082(3)(d), 893.13(1)(a)(2), Fla. Stat. (1997).
In implicitly receding from Klayman and eviscerating the due process protections of Fiore in this state, the majority unnecessarily places Klayman in the shadow of this Court's decisions in the two Bunkley cases. See Bunkley v. State, 833 So.2d 739 (Fla.2002) (Bunkley I), vacated, 538 U.S. 835, 123 S.Ct. 2020, 155 L.Ed.2d 1046 (2003) (Bunkley II), on remand, 882 So.2d 890 (Fla.2004) (Bunkley III). In Bunkley I, the Court, applying Witt, denied retroactive application of a decision in what the Court termed a "routine statutory construction case." 833 So.2d at 746. The issue of the common pocketknife exception addressed in L.B. v. State, 700 So.2d 370 (Fla. 1997) which the petitioner in Bunkley sought to apply retroactively, reached us not via discretionary interdistrict conflict jurisdiction but rather in a mandatory review of a Second District decision declaring a statutory provision unconstitutional. Until the Second District decision in L.B. v. State, 681 So.2d 1179 (Fla. 2d DCA 1996), at all pertinent times, including when Bunkley's conviction became final, Florida's district courts had uniformly held that the determination whether a particular knife fit within the common pocketknife exception to the definition of a deadly weapon was for the jury. See Bunkley III, 882 So.2d at 895 (observing that in holding the provision void for vagueness, "the Second District's decision in L.B. confirm[ed] the rule that whether a knife fell within the `common pocketknife' exception was a jury question"). Thus, under Bunkley III, when we decided in L.B. that a pocketknife with a blade of less than four inches was a common pocketknife as a matter of law, we created a nonretroactive change in the law. We did not, as in Hayes, clarify unsettled law, which pursuant to Fiore would invalidate final convictions for conduct that did not constitute a crime under the law as clarified.
The decision that Barnum asks us to apply here, Darryl Thompson v. State, 695 So.2d 691 (Fla.1997), resolved conflicting district court statutory interpretations on the enhanced or aggravated offense of attempted murder of a law enforcement officer. The First District had held that knowledge of the victim's status was not an essential element of attempted murder of a law enforcement officer. See Carpentier v. State, 587 So.2d 1355, 1357 (Fla. 1st DCA 1991). The Fifth District had concluded to the contrary. See Grinage v. State, 641 So.2d 1362, 1365 (Fla. 5th DCA 1994), approved on other grounds, 656 So.2d 457 (Fla.1995). Thus, there was a law of the First District and a conflicting law of the Fifth District, but no law of the state. Not until this Court's decision in Darryl Thompson was there law of the state correctly interpreting section 784.07(3), Florida Statutes (1993), to require proof of knowledge that the victim was a law enforcement officer. In Darryl Thompson we construed section 784.07(3) as it had existed from its enactment in 1988, despite the First District's erroneous interpretation in Carpentier.[14] This *535 Court's decision in Darryl Thompson clarified section 784.07(3) by holding that knowledge that the victim was a law enforcement officer was indeed an essential element of the offense.
In my view, when we determine whether decisions such as Hayes and Darryl Thompson apply to final convictions, the credibility of the system is at stake. Once we accept jurisdiction to resolve a conflict and interpret a statute, defendants throughout the state who were convicted for conduct that does not constitute a crime under our interpretation of the statute should reap the benefit of that decision, regardless of when they were convicted. The harmony brought to the law by this Court's conflict resolution should benefit all who were casualties in the conflict, no matter when their convictions became final. This to me is the essence of due process of law as viewed through the lens of Fiore.
Howeverand this bears emphasisrelief under Fiore is limited to those defendants whose conduct does not constitute a crime as a matter of law under the law as properly interpreted. In contrast to Klayman and Fiore, the law as correctly interpreted by this Court in Darryl Thompson created only a question of fact as to Barnum. Our decision in Darryl Thompson made the defendant's knowledge, which had been irrelevant under several district court opinions, an issue for the jury. Because intent is a mental state seldom subject to direct proof, the determination whether the defendant knew that the victim was a law enforcement officer is an issue that in most circumstances remains for the jury. See Washington v. State, 737 So.2d 1208, 1215-16 (Fla. 1st DCA 1999) ("The law is clear that a trial court should rarely, if ever, grant a motion for judgment of acquittal on the issue of intent. This is because proof of intent usually consists of the surrounding circumstances of the case.") (citation omitted).
In Barnum's trial, the victim of the alleged attempted murder testified that he announced that he was a police officer but did not display a badge when he confronted Barnum during a car burglary. Barnum testified that he did not believe that the victim was a police officer. Barnum v. State, 849 So.2d 371, 372 (Fla. 1st DCA 2003). The State's evidence, though disputed, was sufficient for the trier of fact to have concluded that this element was met had the jury been instructed thereon. This is different from Fiore and Klayman, in which the clarifications of the law provided in other cases established that the defendants were convicted of crimes that did not take place under the law as correctly interpreted.[15] Barnum's conviction does not violate due process under Fiore or Klayman because Barnum does not stand convicted for conduct that, under the statute as properly interpreted, does not constitute a crime. The First District's certified question should be answered in the negative.
Unfortunately for Barnum, the evidence remains sufficient to support conviction of the aggravated offense of attempted murder of a law enforcement officer even under the law as clarified in Darryl Thompson. Therefore, my views, like those of *536 the majority, do not avail Barnum relief. Because the majority bases its conclusion on grounds with which I cannot fully agree, in particular its evisceration of Klayman, I concur in result only.
Finally, because of the implications of the majority's opinion, and despite our previous discouragement of certified questions on issues of first impression, I would urge district courts of appeal to certify questions of great public importance when they are the first to address an issue of statutory interpretation that could determine whether the defendant's conduct constitutes a crime.
ANSTEAD and QUINCE, JJ., concur.
QUINCE, J., concurring in result only.
I agree with the majority that Henry Barnum is not entitled to relief and his conviction should not be vacated. I do so because Barnum was not convicted of a nonexistent crime, and therefore the principles enunciated in Fiore v. White, 531 U.S. 225, 121 S.Ct. 712, 148 L.Ed.2d 629 (2001), and State v. Klayman, 835 So.2d 248 (Fla.2002), do not change the outcome in this case.
However, I cannot agree with the majority that we should recede from our decision in Klayman. This court decided Klayman after the decision in Hayes v. State, 750 So.2d 1 (Fla.1999). The issue presented in Hayes was whether there existed the crime of drug trafficking when a defendant was in possession of numerous hydrocodone tablets but each individual tablet contained no more than 15 milligrams of hydrocodone. Several district courts of appeal addressed the issue. The Fifth and Fourth Districts held that defendants under these circumstances could be convicted of trafficking.[16] The First and the Second Districts, however, found that such facts did not demonstrate a crime of trafficking.[17] We resolved the conflict and answered that question in the negative, holding a defendant in possession of numerous hydrocodone tablets could not be convicted of drug trafficking when the individual tablets possessed contained no more than 15 milligrams of hydrocodone.
Thereafter, in Klayman we considered whether or not a defendant who was convicted of drug trafficking under the circumstances outlined in Hayes was entitled to relief based on Hayes. In finding that a defendant was entitled to relief for a conviction for a nonexistent crime, we distinguished changes in the law from clarifications of the law and concluded that the situation presented in Hayes was a clarification of the law. Thus, we held that where there had been differing decisions on the same issue by the various courts of appeal and one interpretation resulted in a defendant being convicted of a nonexistent crime, this Court's resolution of the conflict was a clarification of the law, stating what the law was from its inception. See Klayman, 835 So.2d at 251.
The Klayman decision is in keeping with the United States Supreme Court's decision in Fiore. In Fiore the Supreme Court concluded that a clarification of the law, which indicates what the law was at the time of a defendant's conviction, was not new law and thus did not present a question of retroactivity. Instead, the question to be answered was whether the defendant could, under due process principles, be convicted of a crime for activity *537 that was not prohibited by the statute. Just as the defendant in Fiore could not be convicted for the crime of failure to have a hazardous waste permit when he in fact had one, the defendant in Klayman could not be convicted of drug trafficking when the amount of drugs possessed did not reach the threshold of the trafficking amount. When this court is faced with situations where the district courts have decided questions of law differently and that difference may result in convictions for nonexistent crimes, the framework outlined in Klayman is a workable one.
While I do not completely agree with this Court's reasoning in Bunkley v. State, 882 So.2d 890 (Fla.2004), cert. denied, 543 U.S. 1079, 125 S.Ct. 939, 160 L.Ed.2d 822 (2005), I do believe that the situation presented in Bunkley is distinguishable from Klayman and should not be used as a basis to recede from Klayman. Unlike Klayman, there were no district court of appeals' opinions interpreting or defining the terms used in the statute that was at issue in Bunkley. In fact there was no district court opinion in Bunkley until the decision that certified a question to this Court. See Bunkley v. State, 768 So.2d 510 (Fla. 2d DCA 2000) (certifying as a question of great public importance whether the decision in L.B. v. State 700 So.2d 370 (Fla.1997), should apply retroactively), approved, 833 So.2d 739 (Fla.2002), vacated, 538 U.S. 835, 123 S.Ct. 2020, 155 L.Ed.2d 1046 (2003). The other decisions from the Second District concerning Bunkley were per curiam affirmances without elaboration. See Bunkley v. State, 569 So.2d 447 (Fla. 2d DCA 1990); Bunkley v. State, 539 So.2d 477 (Fla. 2d DCA 1989).
For years, no district court of appeal squarely addressed in a written opinion the issue of whether or not a knife with a certain blade length was a common pocket-knife or a weapon. See §§ 790.001(13), 790.115(2), Fla. Stat. (2004). It was generally accepted that the issue of whether a particular knife was a weapon was a question of fact to be determined by a jury. It was only after the Second District in L.B. v. State, 681 So.2d 1179 (Fla. 2d DCA 1996), rev'd, 700 So.2d 370 (Fla.1997), declared section 790.001(13) unconstitutionally vague, because the term "common pocketknife" was vague, that the question came to this Court for resolution.
In resolving the constitutional issue presented in L.B. and in determining the retroactivity issue in Bunkley, this Court was not faced with a situation where the various district courts of appeal were deciding the same issue of law differently. In fact, as far as can be determined, the district courts appear to have been deciding the issue, over a number of years, in the same manner as the Second District decided all of Bunkley's claims. Thus, Klayman and Bunkley came to this Court in different procedural postures.
However, I agree with Chief Justice Pariente that we need not recede from Klayman. The case before us does not present the situation where a district court opinion results in a conviction for a nonexistent crime. This Court's resolution of the conflict issue in Thompson v. State, 695 So.2d 691 (Fla.1997), did not lead to Barnum being convicted for a nonexistent crime. Therefore, the issue of whether Barnum is entitled to relief is purely a matter of applying the retroactivity analysis articulated in Witt v. State, 387 So.2d 922 (Fla.1980), to the Thompson issue. Application of Witt to this case demonstrates that Thompson should not be retroactively applied to convictions that are final. The principles espoused in Fiore and Klayman are simply not applicable here.
Therefore, while I agree that Barnum is not entitled to relief under the Witt analysis, *538 I do not believe that this Court should recede from the principles espoused in our Klayman decision. Thus, I concur in the result only.
PARIENTE, C.J., and ANSTEAD, J., concur.
NOTES
[1] We originally accepted jurisdiction in this action on the basis of a question of great public importance certified by the First District Court of Appeal. See Barnum II, 849 So.2d at 375 (certifying the following question as one of great public importance: "Whether the analysis of State v. Klayman, 835 So.2d 248 (Fla.2002), applies when an issue that the Supreme Court has clarified requires resolution of a disputed factual matter?"). However, upon further review, we decline to answer the certified question as worded and instead base our jurisdiction upon the basis of certified conflict of decisions of the district courts of appeal.
[2] In 1995, subsection (3) was removed from section 784.07. See ch. 95-184, §§ 17, 20, Laws of Fla.
[3] Thompson was decided more than one year after Barnum's conviction became final on appeal.
[4] Witt v. State, 387 So.2d 922 (Fla. 1980).
[5] In the words of the Witt Court:

It has long been recognized that, for several reasons, litigation must, at some point, come to an end. In terms of the availability of judicial resources, cases must eventually become final simply to allow effective appellate review of other cases. There is no evidence that subsequent collateral review is generally better than contemporaneous appellate review for ensuring that a conviction or sentence is just. Moreover, an absence of finality casts a cloud of tentativeness over the criminal justice system, benefiting neither the person convicted nor society as a whole.
Id. at 925.
[6] The majority decision in Bunkley I did not, however, even cite the then-recent decision in Klayman.
[7] The United States Supreme Court determined that the question was not just one of retroactivity, because retroactivity is not an issue if the Florida Supreme Court's interpretation of the "common pocketknife" exception in L.B. was a correct statement of the law at the time of Bunkley's conviction. See Bunkley, 538 U.S. at 840, 123 S.Ct. 2020 ("The proper question under Fiore is not whether the law has changed. Rather, Fiore requires that the Florida Supreme Curt answer whether, in light of L.B., Bunkley's pocketknife of 2 1/2 to 3 inches fit within [the] "common pocketknife" exception at the time his conviction became final.").
[8] In contrast to this Court's extremely limited jurisdiction set forth in article V, section 3, of the Florida Constitution, the Pennsylvania Supreme Court has more broadly defined jurisdiction to review the decisions of Pennsylvania's intermediate appellate courts, and appears to have the power to assume jurisdiction of proceedings in any Pennsylvania court. See e.g., 42 Pa. Cons. Stat. Ann. § 724(a) (2004) (noting that "[e]xcept as provided by section 9781(f) ... final orders of the Superior Court and final orders of the Commonwealth Court not appealable under section 723 ... may be reviewed by the Supreme Court upon allowance of appeal by any two justices of the Supreme Court upon petition of any party to the matter"); 42 Pa. Cons. Stat. Ann. § 726 (Supp. 2005) (granting the Supreme Court the authority to, on its own motion or upon petition by a party, "in any matter pending before any court or magisterial district justice of this Commonwealth involving an issue of intermediate public importance, assume plenary jurisdiction of such matter at any stage thereof and enter a final order or otherwise cause right and justice to be done").
[9] Our mandatory jurisdiction is limited to:

1. trial court judgments imposing the death penalty;
2. district court decisions invalidating a state statute or a provision of the state constitution;
3. administrative actions of statewide agencies relating to utility service and rates; and
4. bond validations by trial courts as provided by law.
Our discretionary jurisdiction may be invoked to review:
1. decisions of district courts expressly declaring a state statute valid; or expressly construing a provision of state or federal constitutions;
2. decisions of district courts expressly affecting a class of constitutional or state officers;
3. decisions of district courts expressly and directly conflicting with one another or with the supreme court on the same question of law;
4. decisions of a district court which certify a question to be of great public importance, or that certify direct conflict with decisions of another district court;
5. Trial court orders and judgments certified by a district court where the appeal is pending to be of great public importance or to have great effect on administration of justice throughout the state and to require immediate resolution by the supreme court; and
6. questions of law certified by the United States Supreme Court or the United States Court of Appeals determinative of a cause of action where there is no controlling precedent of the Florida Supreme Court.
See art. V, § 3, Fla. Const.
[10] This passage makes clear that the Bunkley Court did not prejudge the issue regarding whether the highest state court's first interpretation of a statutory provision necessarily constitutes a "clarification" as opposed to a "change" in the law. Accord Clem v. State, 119 Nev. 615, 81 P.3d 521, 529 (2003). In Klayman, we appear to have selected an unworkable construct. "Where a change in decisional law has occurred, the only question under Fiore is: when did the change occur, before or after the defendant's conviction became final?" Id.
[11] A corollary pointin Moreland, the defendant had preserved the issue of the constitutionality of the administrative order, just as the defendant in Spencer had. Here, the defendant in Thompson had preserved the relevant issue by requesting a jury instruction that knowledge was an element of section 784.07(3), see Thompson, 695 So.2d at 691, while Barnum did not. Therefore, Barnum and Thompson, although both convicted of the same offense, were not identically situated defendants. Because their positions were not identical, there is no guarantee, as there was in Moreland, that we would have decided Barnum's case as we eventually did in Thompson.
[12] The petitioner's first name is used to distinguish this opinion from Darryl Thompson v. State, 695 So.2d 691 (Fla.2004), which is discussed in the majority opinion and in my opinion below.
[13] This Court issued two decisions with opinions in Bunkley's case, the first on review of the Second District's decision, the second on remand from the United States Supreme Court. See Bunkley v. State, 833 So.2d 739, 746 (Fla.2002) vacated, 538 U.S. 835, 123 S.Ct. 2020, 155 L.Ed.2d 1046 (2003), on remand, 882 So.2d 890 (Fla.2004). Herein, I identify our first decision as Bunkley I, the United States Supreme Court's decision on certiorari review as Bunkley II, and our decision on remand from the United States Supreme Court as Bunkley III.
[14] The issue of whether section 784.07(3) included a knowledge element was clouded by uncertainty as to whether the enhanced punishment in the case of a law enforcement victim aggravator applied to all degrees of attempted murder or only attempted first-degree murder. In a case decided before our decision in Darryl Thompson, we held that both section 784.07(3) and the accompanying twenty-five-year mandatory minimum term in section 775.0825 applied only to attempted first-degree murder of a law enforcement officer. See State v. Iacovone, 660 So.2d 1371, 1374 (Fla. 1995).
[15] Also distinguishable is our 2004 Thompson decision concerning the statute governing felony driving while license suspended, in which we held the due process principles of Fiore required relief from a conviction that relied on predicate offenses that the State "did not and could not prove." 887 So.2d at 1266.
[16] See State v. Hayes, 720 So.2d 1095 (Fla. 4th DCA 1998), quashed, 750 So.2d 1 (Fla. 1999); State v. Baxley, 684 So.2d 831 (Fla. 5th DCA 1996).
[17] See State v. Perry, 716 So.2d 327 (Fla. 2d DCA 1998); State v. Holland, 689 So.2d 1268 (Fla. 1st DCA 1997).